[Civ. No. 24997. Second Dist., Div. Three. Feb. 28, 1961.]

LEONARD FERRIS et al., Respondents, v. CITY OF ALHAMBRA, Appellant.

Dunlap, Holmes, Ross & Woodson for Appellant.

H. Kenneth Hutchinson, in pro. per., McLaughlin & Casey and James A. McLaughlin for Respondents.

BISHOP, J. pro. tem.*—The defendant city has appealed from a judgment decreeing that an ordinance adopted by its legislative body, rezoning some 30 acres within its boundaries, was unreasonable, void, invalid and of no force and effect, and enjoining the city from giving it any force and effect. We have concluded that the judgment must be reversed because the issues decided in favor of the four plaintiffs and against the city, upon whose determination the judgment rests, were issues that the law entrusts, for decision, to the city's legislative body and not to the courts.

The trial proceedings take up 648 pages of reporter's transcript, yet the actual facts of the case—to be distinguished from the conclusions drawn from them—are really not in dispute. In the main, we take our recital of the facts, that are pertinent to the appeal, from the findings of fact. A 30-acre tract of land (31.55 acres, to be exact), lies within the defendant city, bounded on the north by Shorb Street and on the south by Valley Boulevard. The four plaintiffs own properties, improved with single family residences, north of Shorb Street but within 300 feet of the 30 acres.

Ever since the city adopted its original zoning ordinance in 1952, comprehensively zoning the land within its boundaries, the properties now owned by plaintiffs and their neighbors (numbering more than 400) have been in an R-1 district, restricted to single family residences. This, too, was the zoning that governed all of the 30 acres, except a strip along Valley Boulevard, 130 feet in width. A parcel, lying in the southeasterly corner of the 30-plus acres, has a retail food market authorized by the granting of a variance.

In August of 1959 the city of Pasadena, the owner of the 30 acres, filed an application with the planning commission of the defendant city, requesting that the acres be rezoned

*Assigned by Chairman of Judicial Council.

C-3, so that there might be constructed and maintained thereon a shopping center. On or about September 11th, a notice was given to plaintiffs, and the other residents living within 300 feet of the 30 acres, that a hearing would be had on September 21st. At the hearing it was found that there were 51 of the property owners living within 300 feet of the 30 acres, expressing themselves as being in favor of the rezoning and 91 opposed. At an adjourned meeting, held a week later, the planning commission recommended that the 30 acres be rezoned for use as C-2 property, excluding a buffer zone, 70 feet wide along the westerly side of the 30 acres, a similar zone along the northerly side and one 94 feet in width along the east side, these buffer zones to remain R-1.

On October 6, 1959, the legislative body of the defendant city met and gave attention to the rezoning problem. One of the city councilmen (the commonly accepted designation of the members of the city's legislative body), requested that consideration of the matter be postponed as some 40 of the interested property owners had already requested. The city councilman who favored delay, or someone, made a charge "that said petitions in favor of this zoning change were obtained by misrepresentation." By a vote of three to one, the city legislative body "proceeded with and voted upon a motion to rezone the said property to a C-3 zone," excepting that the three proposed buffer strips be placed in a P-1 zone.

On October 27th the city's legislative body met again, this time with all five members in attendance. Written protests against the rezoning were filed by 84 interested property owners; an unstated number spoke, some in favor of and others against it. By a vote of three to two, action favorable to the rezoning, with the P-1 buffer strips, was taken, and the ordinance drafted to effect the change was given its first reading. On November 3d the city's legislative body held another meeting, the ordinance was given a public hearing, and, because of a doubt expressed by the city attorney as to the validity of the notice of the meeting of October 27th, another three to two vote was taken. Another meeting was held on November 10th at which time the city attorney advised and recommended that, before action be taken, consideration be given to amending the overall 1952 ordinance in order to correct defects existing in it. The city engineer "forwarded a communication" directing attention to problems of drainages, etc., in connection with any such proposed rezoning. Eighty-four written protests were presented; whether

those on hand at the October 27th meeting, or a fresh batch, does not appear. In spite of all these efforts at delay, the rezoning ordinance "was read, approved and adopted" by the usual three to two vote and was then duly published.

It would be well, before proceeding to consider the findings of fact upon which the judgment really rests, to note that none of those so far considered do support it. ▮ We begin by pointing out that the charter of the defendant city makes no pretense of prescribing the procedures for zoning (Stats. 1915, pp. 1740 et seq., as amended some seven times), so that the provisions of sections 65800-65808 of the Government Code control. ▮ We find it stated in *Banville* v. *County of Los Angeles* (1960), 180 Cal.App.2d 563, 570 [4 Cal.Rptr. 458, 462]: "Amendments to a zoning ordinance which change property from one zone to another are adopted in the same manner as the original zoning ordinance . . . . (Gov. Code, § 65803.)" See also *Hein* v. *City of Daly City* (1958), 165 Cal.App.2d 401, 403 [332 P.2d 120, 121-122], and cases cited. The procedure we find in sections 65650-65659 of the Government Code. We need not have these sections spread before us, for no claim was made in the complaint that any required procedural step was lacking; no failure to proceed in due order is reported in the findings; and the respondents rely on no failure to follow code provisions. Proper notices of the planning commission's hearings appear to have been given. If, as suggested by the city attorney, there was a failure to give proper notice of the hearing held on October 27th by the city's legislative body, its action was repeated at a later meeting, due notice of which no one questions.

The planning commission held hearings September 21st and September 28th. The city's legislative body had the subject up for consideration October 6th, 27th and November 3d before the meeting of November 10th, at which session the ordinance under attack was finally passed. There was no undue haste, no "railroading."

▮ Protests were made by a majority of the property owners interested, it is true, but the code sections do not give protesting property owners a veto power over zone changes; these protests could be "disregarded" and "ignored" by the city's legislative body with impunity (except such results as might be expected at the next election). No statutory provision requires the legislative body of a city to follow the advice and recommendations of its city attorney, nor need it

hold its hand because of a communication from its city engineer directing its attention to problems involved in the rezoning.

Someone charged ''that said petitions in favor of this zoning change were obtained by misrepresentation.'' We interpret ''said petitions'' as being those of the minority group who appeared as proponents of the proposed zone change, for they had not initiated the matter; the owner of the 30 acres took the first action. And if they had, we fail to see what difference it would have made; zone changes are not dependent upon petitions being filed.

 The planning commission did not recommend the change in the zone affecting the 30 acres that was accomplished by the ordinance under attack, but recommended a less sweeping change. Here, again, the validity of the ordinance is in no wise affected. The comprehensive zoning ordinance of the city undertakes to prescribe some of the steps for its amendment. Good or bad, we note this paragraph in its section 17.10, brought before the court by plaintiffs' complaint: ''The City Commission [legislative body] after receipt of the report and recommendations from the Planning Commission shall take such action as said . . . [legislative body] may deem proper.'' We read, further, in *Banville* v. *County of Los Angeles, supra* (1960), 180 Cal.App.2d 563, 570 [4 Cal.Rptr. 458, 462] : ''The Government Code provisions require that there be a hearing before a planning commission and a recommendation to the Legislative body. (§§ 65650, 65653.) However, the recommendation of the planning commission does not necessarily have to be followed by the legislative body.''

Now we come to the ''Findings of Fact'' made by the trial court which, we are satisfied, contain the basic reason for its judgment. We are quite aware that one fatal wound is sufficient to cause death, although there may be many that are not serious, and if we had discovered among the findings one that justified the judgment, we would be content to note it. Finding none, however, and paragraphs XIII, XIV, XV and XVI of the findings being altogether too long to quote, we are selecting some portions, fairly illustrative of the whole, in support of our conclusion that the trial court disapproved of the zone-changing ordinance because of answers to questions left, not to it, but to the city's legislative body. We quote less than half of the paragraphs referred to : ''That the said three City Councilmen who voted in favor of the rezoning ordinance

disregarded the public welfare, health, safety and convenience of the residents of the defendant City who resided in the areas adjacent to the subject property and voted in favor of the said rezoning ordinance to assist Harold Hamlin and the City of Pasadena in promoting and developing the said property for C-3 uses, and that the said three City Councilmen disregarded the detrimental effect of the said rezoning ordinance upon the property owners in the areas adjacent to the subject property. . . .

"That the City Council in voting in favor of the said rezoning ordinance disregarded all such principles of good planning and did not apply them in any respect. That the City Councilmen voting in favor of such rezoning have conceded that the said rezoning ordinance did not rezone the subject property in accordance with approved and good zoning practices. . . .

"That the subject property is suitable for commercial uses and that the commercial uses described in the C-2 zone of the Land Use Zoning Ordinance are more adapted to the subject property, and the subject property is more adapted to such uses, provided that adequate buffer space is provided to prevent the construction and maintenance of buildings in close proximity to the residences in the residential areas surrounding such property. That there is no immediate need for the development of the subject property for business purposes, in that there is presently existing vacant property on the southerly side of Valley Boulevard which is available for uses of the type permitted in C-3 zones under the said Land Use Zoning Ordinance. . . . That such appropriate legislative action must also be accompanied by the study of and the making of provisions with respect to the installation of necessary storm drains, sewers, lighting, and the preparation and recording of a subdivision or subdivision maps in order to accomplish the best uses of the subject property as a commercial shopping center, and at the same time to provide protection to the residents and their properties in the areas surrounding such shopping center."

But for the fact that the defendant city had adopted a comprehensive zoning scheme for the entire city, the plaintiffs, of course, would have no right to complain of any use made of the 30 acres that did not constitute a nuisance. It has been recognized that, although an amending ordinance is limited in its immediate effect to property that is not plaintiffs', they do have an actionable interest if the ordinance has been adopted without following the procedure prescribed

(*Hein* v. *City of Daly City, supra* (1958), 165 Cal.App.2d 401, 403 [332 P.2d 120, 121-122]), and we assume that, had it been made to appear in this case that the legislative body had acted arbitrarily, without reason, the plaintiffs could properly seek relief.

Even granting that the plaintiffs would be better off if the zone change had not been made, that fact does not affect its validity. In the first place, they have no vested interest that enables them to prevent a zone change. As stated in *Case* v. *City of Los Angeles* (1956), 142 Cal.App.2d 66, 69 [298 P.2d 50, 52]: "The changing of the zone from C-2 to C-M on the 3⅓ acres of land belonging to Hollywood Village Inc. does not restrict plaintiffs in the use of their own property. They have no vested right in the maintenance of restrictions on the property of defendants. It may be true that to continue the zoning restrictions upon defendants' property would confer benefits on neighboring owners, including plaintiffs, and enhance the value of their properties, but the existence of such benefits does not generate interests protected by the Constitution against diminution by governmental authorities in the proper exercise of the police power. The city in the exercise of its police power has the right to modify its zoning regulations from time to time." Similar expressions may be found in *Triangle Ranch, Inc.* v. *Union Oil Co.* (1955), 135 Cal.App.2d 428, 436, 437 [287 P.2d 537, 542].

In a way it is restating the principle just noted to say that the fact that a zone change may have an adverse effect upon the value of neighboring land does not operate as a reason for holding the change bad. In *Robinson* v. *City of Los Angeles* (1956), 146 Cal.App.2d 810, 815-816, [304 P.2d 814, 816], it was declared: ". . . every intendment is in favor of validity of the action of the legislative authority, which will not be overthrown unless plaintiff produces evidence establishing physical facts justifying, or rather requiring, the conclusion that the ordinance is as a matter of law unreasonable and invalid. [Citing cases.] The fact that plaintiffs' property may depreciate in value as a result of rezoning does not establish unreasonableness or invalidity, for '[d]amage caused by the proper exercise of the police power is merely one of the prices an individual must pay as a member of society.' (*Reynolds* v. *Barrett*, 12 Cal.2d 244, 250 [83 P.2d 29]; see also authorities last hereinbefore cited.)

If the matter is debatable, if reasonable minds may differ upon the question of whether the zoning is required by

or consistent with the public welfare, the courts may not interfere. [Cases cited.] ▮ The boundary between different zones inevitably must be drawn and that is the function of the municipality, not the courts. [Cases cited.] The wisdom of the decision is not subject to judicial review. (*Wheeler* v. *Gregg,* 90 Cal.App.2d 348, 361 [203 P.2d 37] ; *Lockard* v. *City of Los Angeles, supra,* p. 461 [33 Cal.2d 453 (202 P.2d 38, 7 A.L.R.2d 990)].)''

The opinion from which we have just quoted deals with another fault such as that which the trial court found with the ordinance under attack here. ▮ We repeat a part of what was further said in the case just cited (*Robinson* v. *City of Los Angeles, supra* (1956), 146 Cal.App.2d 810, 816-817, [304 P.2d 817]) : ''The argument that development of the 785 acres (1.226 square miles) for industrial uses would create intolerable congestion of traffic and inadequacy of sewer service presupposes that roads and sewers will remain in their present limited capacity, rather than growing in proportion to increasing public demands. This is a faulty notion of the basis for testing validity of a zoning, which necessarily looks to the future and proceeds upon the assumption that development of properties and facilities within and without the zoned area will proceed harmoniously with its requirements. . . . The fact that the city's plans for future handling of problems growing out of the development of this 785 acres are today in the formative stage is not determinative of plaintiffs' rights, nor is it prophetic of municipal ills which appellants predict.''

▮ Nor are the motives of the legislative body to be weighed in measuring the legality of their action. (*McCarthy* v. *City of Manhattan Beach* (1953), 41 Cal.2d 879, 894 [264 P.2d 932, 940] ; see also *People* v. *City of Palm Springs* (1958), 51 Cal.2d 38, 46-47 [331 P.2d 4, 9].)

It may be, were we called upon to decide, we would say that the trial court had the better of it; that indeed it would have been better zoning had the experts been followed, and the recommendation of the planning commission prevailed. But this is not the question that we are called upon to answer, and it was not the question before the trial court.

If further support is needed for our conclusion that the crucial questions respecting the advisability of the ordinance that the judgment condemned, were questions for the city's legislative body and not for the courts, it can be found in passages too lengthy to quote, in *Lockard* v. *City of Los Angeles, supra,* 33 Cal.2d 453 [202 P.2d 38, 7 A.L.R.2d 990] ;

*Clemons* v. *City of Los Angeles* (1950), 36 Cal.2d 95 [222 P.2d 439] ; and *Johnston* v. *City of Claremont* (1958), 49 Cal. 2d 826 [323 P.2d 71].

It was not made to appear, as a matter of law, that the action of the city's legislative body was either irregularly taken, or went beyond the bounds of reason. The judgment that sets the action aside is reversed.

Vallée, Acting P. J., and Ford, J., concurred.

A petition for a rehearing was denied March 9, 1961, and respondents' petition for a hearing by the Supreme Court was denied April 26, 1961.